**IMMIGRANT ASSISTANCE PROJECT OF THE LOS ANGELES COUNTY FEDERATION OF LABOR (AFL-CIO); Travelers & Immigrants Aid of Chicago; Hermandad Mexicana Nacional; Washington Association of Churches; One Stop Immigration; In-**

---

ternational Institute, San Francisco; International Institute (East Bay); John Does Nos. 1 Through 8; Jane Does Nos. 1 Through 4, Plaintiffs–Appellees,

v.

IMMIGRATION AND NATURALIZA-TION SERVICE; James Ziglar, Commissioner of the INS; * Department of Justice; John Ashcroft, Attorney General of the United States; ** Department of State; Colin L. Powell, Secretary of State,*** Defendants–Appellants.

No. 99–35472.

United States Court of Appeals, Ninth Circuit.

Submission Deferred Jan. 6, 2000.

Re–Submitted Sept. 17, 2001.****

Filed Sept. 24, 2002.

* James Ziglar is substituted for his predecessor Doris Meissner. Fed. R.App. P. 43(c)(2).

** John Ashcroft is substituted for his predecessor Janet Reno. Fed. R.App. P. 43(c)(2).

*** Colin L. Powell is substituted for his predecessor Madeline Albright. Fed. R.App. P. 43(c)(2).

**** This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Lisa M. Arnold, Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, and Christopher Pickrell, Assistant United States Attorney, Seattle, WA, for the defendants-appellants.

Robert Pauw, Gibbs, Houston & Pauw, Seattle, WA; Peter Schey, Center for Human Rights and Constitutional Law, Los Angeles, CA; and Michael Rubin, Altshuler, Berzon, Nussbaum, Berzon and Rubin, San Francisco, CA, for the plaintiffs-appellees.

Before HUG, PREGERSON, and FERGUSON, Circuit Judges.

## OPINION

PREGERSON, Circuit Judge.

Plaintiffs–Appellees are illegal immigrants and organizations assisting such immigrants who seek to legalize their status under a legalization program in the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1255. The legalization program was established to benefit aliens who have unlawfully resided in the United States since 1982. Plaintiffs challenge policies and practices adopted by Defendant–Appellant Immigration and Naturalization Service ("INS") to implement IRCA's requirement that the aliens' unlawful status must have been "known to the government" since 1982 to receive legalization under the statute. See 8 U.S.C. § 1255a(a)(2)(B).

The District Court agreed with plaintiffs and issued a preliminary injunction that ordered the INS to use a specific burden-shifting mechanism for meeting the "known to the government" requirement. This Court affirmed, but the Supreme Court vacated, on jurisdictional grounds. After plaintiffs filed a Second Amended Complaint, the District Court found jurisdiction, certified a class, and granted another preliminary injunction based on the first one. This Court remanded, again on jurisdictional grounds. The District Court once more found jurisdiction and reinstated its class certification and also reinstated, in modified form, its preliminary injunction.

The INS appeals the District Court's reinstatement of the class certification and the preliminary injunction. In addition, the INS argues that the Second Amended Complaint is untimely and that, in any event, this action should be dismissed in its

entirety because jurisdiction is lacking and venue in the Western District of Washington is improper. We hold that the District Court did not err when it reinstated the class certification and the preliminary injunction. We also hold that the Second Amended Complaint is timely because it relates back to the original Complaint. We hold, moreover, that those individual plaintiffs who alleged that they filed a legalization application satisfy all jurisdictional requirements. We finally hold that those individual plaintiffs who alleged that the challenged INS policies and practices prevented them from filing an application should be allowed to amend further the complaint to satisfy certain jurisdictional requirements that Congress adopted after the Second Amended Complaint was filed.[1] After such further amendment, the District Court will have to determine whether venue in the Western District of Washington is proper.

## FACTUAL AND PROCEDURAL BACKGROUND

Since this action was filed in 1988, it has gone from the District Court through the Ninth Circuit to the Supreme Court, back to the District Court, and now again to the Ninth Circuit, without ever being finally resolved. It is one of several actions filed in this and other circuits, with similar procedural histories, challenging different policies and practices used by Defendant–Appellant Immigration and Naturalization Service ("INS") to implement a legalization program adopted by Congress as part of the Immigration Reform and Control Act of 1986 ("IRCA"). See 8 U.S.C. § 1255a. During the course of this litigation, numerous decisions addressing equal-ly numerous questions were issued. Because of these complexities, we summarize below only the most important decisions, and we do so only with respect to questions actually at issue in this appeal.

The IRCA provides, in relevant part, that the Attorney General shall adjust the status of an illegal alien to that of an alien lawfully admitted for temporary residence if the alien meets three requirements. See 8 U.S.C. § 1255a(a).[2] First, the alien had to apply for such adjustment within the 12–month period between May 5, 1987, and May 4, 1988. See id. at § 1255a(a)(1)(A); 8 C.F.R. § 245a.2(a)(1). Second, the alien must establish that he continuously and unlawfully resided in the United States since January 1, 1982, until the date on which he filed for adjustment. See 8 U.S.C. § 1255a(a)(2)(A). Most importantly in the context of this lawsuit, as part of this requirement, "[i]n the case of an alien who entered the United States as a nonimmigrant before January 1, 1982, the alien must establish that the alien's period of authorized stay as a nonimmigrant expired before such date through the passage of time or the alien's unlawful status was known to the government as of such date." Id. at § 1255a(a)(2)(B) (emphasis added). Third, the alien must establish that he has been continuously physically present in the United States since November 6, 1986. See id. at § 1255a(a)(3)(A). "[B]rief, casual, and innocent absences from the United States" do not prevent the alien from meeting this continuous presence requirement. Id. at § 1255a(a)(3)(B). The House Report accompanying the IRCA stated that this legalization program "should be implemented in a liberal and generous

---

1. The organizational plaintiffs should similarly be allowed to amend the complaint.

2. The IRCA further provides that such an alien is entitled to adjustment to permanent residency if he meets additional requirements. See 8 U.S.C. § 1255a(b)(1).

fashion." H.R.Rep. No. 682(I) at 72, *reprinted in* 1986 U.S.C.C.A.N. at 5676.

On March 24, 1988, the original Complaint in this action was filed. Some of the plaintiffs were individual aliens who alleged that they wished to qualify for legalization but were made ineligible for legalization by the INS's interpretation of the IRCA's "continuous unlawful residence since 1982" and "known to the government" requirements. Plaintiffs argued that the INS's interpretation of these requirements violated the IRCA as well as the due process and equal protection clauses of the Fifth Amendment. Other plaintiffs were organizations who alleged that they provided legal and other assistance to aliens seeking legalization and that the INS's illegal interpretation of the IRCA's "continuous unlawful residence since 1982" and "known to the government" requirements made such assistance more difficult and less effective. The Complaint sought class certification and declaratory and injunctive relief.[3]

On November 4, 1988, the District Court entered an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. The District Court found that the organizational plaintiffs had standing to sue because they had alleged that the INS's policies and practices impaired their organizational goals and drained their resources, causing an injury to these organizational plaintiffs. The District Court also found, however, that the individual plaintiffs did not have standing to sue because only aliens who had actually filed legalization applications could obtain "meaningful judicial relief" and because none of the individual plaintiffs alleged that they had actually filed applications. Accordingly, the District Court dismissed all individual plaintiffs from the lawsuit. On the same day, the District Court also entered an Order Denying Plaintiffs' Motion for Provisional Class Certification. The District Court concluded that because the individual plaintiffs did not have standing and, therefore, did not have valid claims, they did not have "claims which are typical of those plaintiffs with valid claims." As a consequence, plaintiffs could not satisfy the "prerequisite" for class certification in Fed.R.Civ.P. 23(a)(3) that "the claims ... of the representative parties are typical of the claims ... of the class."[4]

On March 7, 1989, the District Court entered an Order Granting in Part Plaintiff's Motion for Summary Judgment, *see Immigration Assistance Project of the Los Angeles County Fed'n of Labor v. INS (AFL–CIO)*, 709 F.Supp. 998 (W.D.Wash. 1989) ("*IAP I*"), which it amended on June 3, 1989, *see Immigration Assistance Project of Los Angeles County Fed'n of Labor (AFL–CIO) v. INS*, 717 F.Supp. 1444 (W.D.Wash.1989) ("*IAP II*").

The District Court granted relief to three groups of applicants. The first group of applicants to which the District Court granted relief consisted of "section 265 violators," i.e., applicants who alleged that: (1) they had failed to file quarterly address reports to the INS as required prior to January 1, 1982, by section 265 of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1305; (2) these section 265 violations made their status unlawful; and (3) the absence of the required address reports from their INS files made

---

3. On or about August 29, 1988, plaintiffs filed an Amended Complaint in reaction to (1) orders issued by the District Court for the District of Columbia in a similar action and (2) new INS regulations.

4. As an independent ground for denial of plaintiffs' Motion for Provisional Class Certification, the District Court determined that the Motion was untimely in violation of Local Rule 23(f)(3).

their unlawful status known to the government and thus entitled them to legalization under the IRCA. Under the INS's interpretation of the "known to the government" requirement, however, an alien who showed that he had violated section 265's address reporting requirement did not meet his burden of proving that his unlawful status was known to the government. *See* 8 C.F.R. § 245a.1(d)(1),(2). The District Court held that section 265 violations do create unlawful status for purposes of legalization eligibility. *See IAP I,* 709 F.Supp. at 1001. The District Court ordered the INS to notify section 265 violators of this holding if the INS did not decide their application within 90 days from the entry of this order. *See IAP II,* 717 F.Supp. at 1448. The District Court also set up a burden-shifting mechanism for section 265 violators with respect to the "known to the government" requirement in § 1255a(a)(2)(B):

> The burden of proof shifts as follows: an applicant must make a prima facie showing that he or she violated the address reporting requirements either by failing to report the address or submitting a false address. Once the applicant makes such a showing, the INS then has the burden of coming forward with proof that the alleged violation and subsequent unlawful status was not known to the government. If the INS does come forward with such evidence, the applicant must then show by a preponderance of the evidence that he or she was in unlawful status and that this unlawful status was known to the government. At all times, the applicant carries the burden of persuasion to prove eligibility for legalization.

*IAP II,* 717 F.Supp. at 1448 (footnote omitted).

The second group of applicants to which the District Court granted relief consisted of "student visa violators," i.e., among others, students who had violated their visas by not fulfilling some condition of these visas, such as taking a required number of class hours. The INS had instructed its application examiners that these students fell under an IRCA requirement according to which they had to "establish that ... the alien's unlawful status was known to the government as of[January 1, 1982]." 8 U.S.C. § 1255a(a)(2)(B). To meet this requirement, these students had to "produce[ ] documentation from a school ... which establishes that the said school forwarded to the [INS] a report that clearly indicated the applicant had violated his or her nonimmigrant student status prior to January 1, 1982." 8 C.F.R. § 245a.1(d)(4). By contrast, the INS had instructed its examiners that students who violated their visas by remaining in the United States after they graduated fell under an IRCA requirement according to which they merely had to "establish that the alien's period of authorized stay as a nonimmigrant expired before [January 1, 1982]." *Id.* The District Court held that the INS's different treatment of students who had violated their visas by not fulfilling some condition of the visa, on the one hand, and students who had violated their visas by remaining in the United States after they graduated, on the other, was "irrational" and, therefore, violated equal protection. *See IAP I,* 709 F.Supp. at 1003. The District Court also set up a burden-shifting mechanism for student visa violators similar to the one it set up for section 265 violators. *See IAP II,* 717 F.Supp. at 1449.

The third and final group of applicants to which the District Court granted relief consisted of "incorrectly reinstated violators," i.e., applicants who, by misrepresentation or mistake, had been incorrectly reinstated to lawful status sometime after January 1, 1982. Plaintiffs alleged that

the INS had unlawfully denied legalization to incorrectly reinstated violators because they failed the "continuous unlawful residence since 1982" requirement of 8 U.S.C. § 1255a(a)(2), at least until the INS's Legalization Appeals Unit determined in *Matter of N*, 19 I. & N. Dec. 760 (1988), that incorrectly reinstated violators were, in fact, eligible for legalization. The District Court ruled that *"Matter of N* is the correct legal ruling" and ordered the INS to "reopen all cases decided prior to and contrary to Matter of N." *IAP I*, 709 F.Supp. at 1004. The District Court also ordered the INS to provide incorrectly reinstated violators with the same notice as section 265 violators if it failed to reopen their cases within 90 days. *See IAP II*, 717 F.Supp. at 1448.

On September 18, 1992, this Court affirmed in part, reversed in part, and remanded to the District Court for further proceedings. *See Legalization Assistance Project of the Los Angeles County Fed'n of Labor (AFL–CIO) v. INS*, 976 F.2d 1198, 1202 (9th Cir.1992) ("*IAP III*").

Regarding section 265 violators, we affirmed the declaratory and injunctive relief granted by the District Court. The following passage from our opinion is worth quoting:

> [T]he district court concluded that section 265 violations were "known to the government" precisely because the INS had no periodic address report on file for the alien as required by statute and regulation. We agree with the district court's conclusion. The record shows that before January 1, 1982, the INS reviewed agency records to determine

whether nonimmigrants had complied with the reporting requirements under section 265. The absence of the required section 265 report identified those in violation. As a consequence of its own practices, the INS had *actual knowledge* of an alien's unlawful status. *IAP III*, 976 F.2d at 1208–09.

Regarding student visa violators, we held that these applicants were not only entitled to the prospective relief granted by the District Court, but also to retroactive relief. Accordingly, we remanded to the District Court "so that any [such] applicants who may have been denied legalization as a consequence of invalid INS regulations may be identified, and granted appropriate relief." *Id.* at 1213.

Finally, regarding all three groups of applicants, we remanded to the District Court "to reconsider plaintiffs' request for an extension of application deadlines in light of" this Court's related decision in *Catholic Social Services, Inc. v. Thornburgh*, 956 F.2d 914 (9th Cir.1992) ("*CSS I*").[5] *IAP III*, 976 F.2d at 1215. On June 1, 1993, the District Court issued a Temporary Protective Order granting the additional relief we ordered in *IAP III*.

On June 18, 1993, the United States Supreme Court vacated *CSS I* and remanded for a new jurisdictional determination. *See Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 46, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("*CSS II*"). The Supreme Court concluded that "[o]rdinarily," a plaintiff's challenge to an INS regulation would become ripe only "when the INS formally

---

**5.** The CSS plaintiffs challenged the INS's interpretation of the IRCA's requirement that the applicant has been "continuously physically present since November, 6, 1986," 8 U.S.C. § 1255a(a)(3)(A), and, in particular, the INS's position that for an applicant's absence from the United States to qualify as a

"brief, casual, and innocent" absence under § 1255a(a)(3)(B) that does not destroy eligibility for legalization, the applicant must have obtained INS approval, or "advance parole," before taking the absence. *See CSS I*, 956 F.2d at 916.

denied the alien's application on the ground that the regulation rendered him ineligible for legalization." *Id.* at 60, 113 S.Ct. 2485.[6] The Supreme Court recognized an exception to this ripeness rule in the case of plaintiffs who had been subjected to the INS's policy of "prefiling rejection of applications" by individuals deemed "statutorily ineligible" for IRCA relief "at the front desk of an INS office." *Id.* at 61–62, 113 S.Ct. 2485. The Supreme Court concluded that the claims of such "front-desked" plaintiffs "should not fail for lack of ripeness," even though the INS never formally denied their (un-filed) applications. *Id.* at 63, 113 S.Ct. 2485. The Supreme Court also concluded, however, that the "mere existence of a front-desking policy" did not make ripe the claims of plaintiffs "who were not actually front-desked," i.e., plaintiffs who did not apply and who, therefore, did not have any applications rejected before filing. *Id.* at 66, 113 S.Ct. 2485. The Supreme Court left open the possibility that "further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply," making their claims ripe. *Id.* at 66 n. 28, 113 S.Ct. 2485.[7]

On November 26, 1993, Justice O'Connor granted the INS's application in the present case to stay the District Court's 1993 Temporary Protective Order pending final disposition of the appeal by the Ninth Circuit. *See INS v. Legalization Assistance Project of Los Angeles County Fed'n of Labor,* 510 U.S. 1301, 1306, 114 S.Ct. 422, 126 L.Ed.2d 410 (1993) *("IAP IV").* Justice O'Connor predicted that if presented with the question, the Supreme Court would grant certiorari and conclude that the IRCA did not give organizational plaintiffs standing to sue on their own behalf. *See id.* at 1305–06, 114 S.Ct. 422. Justice O'Connor cautioned, however, that the IRCA gave organizational plaintiffs standing to sue on behalf of members whose claims are ripe under *CSS II. See IAP IV,* 510 U.S. at 1306, 114 S.Ct. 422. Two weeks later, the Supreme Court, without further discussion, granted certiorari, vacated the judgment, and remanded the case for further consideration in light of, *inter alia, CSS II. See INS v. Legalization Assistance Project of Los Angeles County Fed'n of Labor,* 510 U.S. 1007, 1007, 114 S.Ct. 594, 126 L.Ed.2d 560 (1993) *("IAP V.").*

In response to *CSS II* and *IAP IV,* plaintiffs lodged a Second Amended Com-

---

**6.** Moreover, the IRCA provides that "[t]here shall be judicial review of . . . a denial [of an application for adjustment of status] only in the judicial review of an order of deportation under section 1105a of this title." 8 U.S.C. § 1255a(f)(4)(A). As a rule, such an appeal must be brought individually before a Circuit Court of Appeals. *See* 8 U.S.C. § 1105a *(repealed by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996). Thus, even after a denial of an application, a class action challenge before a District Court would normally be barred. In *Naranjo–Aguilera v. INS,* 30 F.3d 1106 (9th Cir.1994), we noted an exception to this rule:

> [D]istrict courts have jurisdiction over "collateral," "procedural" challenges to INS practices in the processing of applica-

tions, such as the front-desking in *CSS* .... Where plaintiffs challenge alleged INS application-processing practices on a nationwide scale, a class action lawsuit with district court discovery mechanisms is an appropriate, and indeed the most effective, method of judicial review.

*Id.* at 1112–13.

**7.** An en banc panel of this Court later held that this group of constructively front-desked plaintiffs with ripe claims "include[d], at a minimum, those who went to an INS office and told their story to an INS officer at the front desk, were told that they were ineligible to apply, and were turned away without an application." *Catholic Social Services, Inc. v. INS,* 232 F.3d 1139, 1146 (9th Cir.2000) (en banc) *("CSS V").*

plaint on May 30, 1995. The Second Amended Complaint again sought class certification and declaratory and injunctive relief.

Most importantly, the Second Amended Complaint added the current individual plaintiffs to the lawsuit. Some individual plaintiffs alleged that they did not file applications for legalization because of the challenged INS policies and practices. Plaintiffs John Doe 1 and John Doe 2, for example, both alleged that they "attempted to file an application for legalization during the application period but w[ere] prevented from applying because of the INS's policies and practices challenged in this lawsuit." Plaintiff John Doe 1 alleged, in particular, that he "presented an application to the Immigration Service at a legalization office" and that "[t]he legalization office refused to accept this application." Similarly, plaintiff John Doe 2 alleged that he "went to a Qualified Designated Entity ('QDE') to file his application"[8] and that "[t]he QDE told [him] that he was not eligible for the legalization program and that they would not accept his application for filing." Two individual plaintiffs, John Doe 5 and John Doe 6, alleged that they filed applications for legalization which have not yet been adjudicated because of the challenged INS practices. Another individual plain-

tiff, John Doe 7, alleged that he filed an application which has been denied because of the challenged INS practices.

The organizational plaintiffs in the Second Amended Complaint were a subset of the organizational plaintiffs in the original Complaint. The allegations they made in the Second Amended Complaint were similar to the allegations they had made in the original Complaint.

On September 8, 1995, the District Court entered an Order Denying Defendants' Motions to Dismiss and Vacate Rulings and Granting in Part Plaintiffs' Motions to Amend Complaint, For Class Certification and for Reinstatement of Temporary Protective Order ("1995 Order"). Regarding the Second Amended Complaint, the District Court concluded that "the proposed organizational plaintiffs do not have standing except insofar as they represent the interests of members whose claims are ripe under CSS [II ]." The District Court further concluded that only individual plaintiff John Doe 1 "presents a paradigm case of 'front-desking,'" but that with regard to all but two of the other individual plaintiffs, "development of further facts should be allowed to establish whether they too satisfy the same ripeness considerations exemplified by the classic front-desking situation described in CSS [II ]."[9] Ac-

---

8. "QDEs are state, local, community, or voluntary organizations authorized by the Attorney General to accept applications under certain conditions. 8 U.S.C. § 1255a(c)(2–3)." CSS v. INS, 232 F.3d at 1143 n. 1.

9. Among the individual plaintiffs the District Court deemed to have claims that are possibly ripe under CSS II are plaintiffs John Doe 2, John Doe 5, and John Doe 6. Among the individual plaintiffs the District Court deemed not to have claims that are possibly ripe under CSS II is plaintiff John Doe 7. The District Court erred in reaching the latter conclusion. Plaintiffs such as John Doe 7 who have filed applications that have been denied have

claims that are ripe under CSS II. See 509 U.S. at 60, 113 S.Ct. 2485. Moreover, if their claims are procedural—as are, we conclude below, the claims in the present case—rather than substantive, they escape the dictates of 8 U.S.C. § 1255a(f)(4)(A). As a result, such procedural claims can be brought—as in the present case—as a class action before a District Court and, unlike substantive claims, do not have to be brought individually before a Circuit Court of Appeals "in the judicial review of an order of deportation." Id.; see also supra note 6. Because plaintiffs did not appeal the District Court's holding that plaintiff John Doe 7 does not have a claim that is

cordingly, the District Court granted plaintiffs' motion for leave to file the Second Amended Complaint. The District Court also granted plaintiffs' motion to certify

> a class of individuals who entered the United States prior to January 1, 1982, who are otherwise eligible for legalization under IRCA, who were deterred from filing an application because of INS's regulations and policies, or who filed an application which has not resulted in a decision, and who fall under one of [the] three categories [described above in connection with the District Court's 1989 orders] involving the 'known to the government' requirement of IRCA.

The District Court further reaffirmed its 1989 orders. The District Court finally reinstated its 1993 Temporary Protective Order to the extent that it required the INS to

> provide written notice to class members; refrain from arresting or deporting individuals who might qualify as class members unless the INS is in possession of reliable information establishing that they are deportable regardless of their eligibility for legalization pursuant to this court's Orders; and provide temporary employment authorizations and other benefits to class members.

The Ninth Circuit granted the INS's motion to stay the District Court's 1995 Order pending interlocutory appeal, and the 1995 Order was never implemented.

possibly ripe under *CSS II,* this issue is not before us.

**10.** An en banc panel of this Court has held that "aliens who filed or attempted to file a completed application and fee with a QDE fall within [this] statutory grant of jurisdiction." *CSS V,* 232 F.3d at 1151 n. 4. *See also supra* note 8.

In 1996, Congress foreclosed the possibility left open by the Supreme Court in *CSS II*—that "class members who were not front-desked" could "demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply" and thus meet the ripeness requirement, 509 U.S. at 66 n. 28, 113 S.Ct. 2485—by amending the IRCA to contain the following provision:

> Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person *in fact filed an application* under this section within the period specified by subsection (a)(1) of this section, or *attempted to file a complete application and application fee* with an authorized legalization officer of the Service but had the application and fee refused by that officer.

8 U.S.C. § 1255a(f)(4)(C) (emphasis added).[10]

On January 16, 1998, this Court applied 8 U.S.C. § 1255a(f)(4)(C) in the CSS litigation and held:

> Because none of the class members or named plaintiffs have alleged that they actually tendered an application and fee or attempted to do so but were rebuffed by a legalization assistant, they do not have standing pursuant to the limited grant of federal court jurisdiction set forth in [8 U.S.C. § 1255a(f)(4)(C).]

*Catholic Soc. Servs., Inc. v. Reno,* 134 F.3d 921, 927 (9th Cir.1998) ("*CSS III* ").[11]

**11.** In 2000, Congress passed the "LIFE Act" and thereby retroactively repealed 8 U.S.C. § 1255a(f)(4)(C) with respect to aliens who before October 1, 2000 ... filed with the Attorney General a written claim for class membership ... pursuant to a court order issued in the case of ... (1) *Catholic Social Services, Inc. v. Meese* ... or (2) *League of United Latin American Citizens v. INS,*

Two weeks later, this Panel remanded the IAP litigation to the District Court "in light of" *CSS III. Immigration Assistance Project of the Los Angeles County Fed'n of Labor (AFL–CIO)*, 134 F.3d 377, 1998 WL 42224, *1 (9th Cir.1998) (unpublished memorandum disposition) ("*IAP VI*"). The Panel noted: "[P]laintiffs' Second Amended Complaint names two individuals, John Doe 1 and John Doe 2, who may have alleged facts sufficient to grant them standing to challenge the legalization procedure of front-desking by the INS." *Id.*

On remand, the District Court initially granted the INS's Motion to Dismiss on the grounds that none of the plaintiffs in the original Complaint had made allegations sufficient to establish standing. The District Court later reversed itself and granted plaintiffs' Motion for Reconsideration on the basis that some of the organizational plaintiffs in the Second Amended Complaint had made allegations sufficient to establish standing as per Justice O'Connor's instructions in *IAP IV.*

On March 3, 1999, the District Court entered an Order on Pending Motions ("1999 Order") that denied the INS's renewed Motion to Dismiss and granted in part plaintiffs' Motion to Reinstate Temporary Protective Relief. The District Court held:

> The court reinstates its [1995] class certification order and reinstates its [1995] order granting temporary relief with the following modifications. The defendants are hereby ordered to: (1) provide the plaintiffs within 30 days of this order the number of applications that have been filed by class members, the number of

such applications that have been adjudicated, and the number that are still pending; (2) provide the plaintiffs with quarterly reports thereafter stating the number of class members applications adjudicated during that period and the number of applications that remain pending; (3) notify all class members with pending legalization applications of the name, address and telephone number of counsel for plaintiffs within 30 days of this order. The court further instructs the INS to adjudicate such applications in accordance with the procedures established in this court's rulings at [*IAP I,*] 709 F.Supp. 998 and [*IAP II,*] 717 F.Supp. 1444 (W.D.Wash.1989).

A week later, the District Court granted the INS's motion to stay its 1999 Order pending appeal, and the 1999 Order, like the 1995 Order, was never implemented.

The INS now asks this Court to find that the Second Amended Complaint is untimely and to remand this case to the District Court with specific instructions to dismiss it in its entirety because jurisdiction is lacking and venue in the Western District of Washington is improper. The INS further asks us, in the event that we do not remand with instructions to dismiss, to vacate the District Court's 1999 Order reinstating the class certification and the preliminary injunction. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## ANALYSIS

### I. Timeliness of the Second Amended Complaint.

#### A. Introduction.

■ The INS argues that the Second Amended Complaint was untimely. A civil

---

[both] vacated sub nom. [*CSS II*], 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Pub.L. 106–553, 1104(b),(c)(8), 114 Stat. 2762 (2000). Thus, for class members in the CSS litigation, Congress restored the *status quo* before 8 U.S.C. § 1255a(f)(4)(C), making *CSS*

*II*, once again, the last word on individual standing and ripeness in that litigation. The LIFE Act does not apply to class members in the present litigation, for whom, therefore, 8 U.S.C. § 1255a(f)(4)(C) remains the law.

action against the United States is time-barred unless the complaint is filed within six years after the right of action accrues. 28 U.S.C. § 2401(a). Whether a claim is barred by a statute of limitations is a question that this Court reviews *de novo*. *See EEOC v. Dinuba Med. Clinic*, 222 F.3d 580, 584 (9th Cir.2000).

Plaintiffs lodged the Second Amended Complaint, which added the current individual plaintiffs and their claims, on May 30, 1995. At the latest, the six-year statute of limitations started to run when the District Court denied the class certification sought in the original Complaint on November 4, 1988. Because more than the six years allowed by § 2401(a) had elapsed between these two dates, the claims of the current individual plaintiffs would normally be time-barred.

■ We do not agree with the District Court that the time between the denial of class certification and the filing of the Second Amended Complaint should be tolled. We hold, however, that the Second Amended Complaint relates back to the original Complaint and is, therefore, timely.[12]

*B. The time between the denial of class certification and the filing of the Second Amended Complaint should not be tolled.*

■ The District Court first observed that "[t]he filing of a class action gives the benefit of the original filing date to all class members and the grant of class certification is retroactive to the date the lawsuit is filed." The District Court then concluded that "[a]lthough the court did not certify the class until 1995, the certification is retroactive to the date the plain-

tiffs filed this suit in 1988." This reasoning is unconvincing because it ignores that the District Court denied class certification in 1988. .

■ The Supreme Court has held that "the commencement of the original class suit tolls the running of the statute for all purported members of the class *who make timely motions to intervene after the court has found the suit inappropriate for class action status.*" *Am. Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (emphasis added). The Supreme Court later clarified this holding when it said in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class *until class certification is denied.* At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Id.* at 354, 103 S.Ct. 2392 (emphasis added). *See also Tosti v. City of Los Angeles*, 754 F.2d 1485, 1488 (9th Cir.1985) (stating that the commencement of a class action tolls the statute of limitations, but that "[t]he statute begins running anew from the date of notice that certification has been denied").

In the present case, the commencement of this class action suit on March 24, 1988—the date of the filing of the original Complaint—tolled the statute of limitations. The statute began running anew when the District Court denied class certification on November 4, 1988. Plaintiffs lodged their Second Amended Complaint, which added the current individual plaintiffs and their claims, on May 30, 1995. Because more than the six years allowed by the statute of limitations elapsed be-

---

**12.** We may affirm the District Court's decision on any basis the record supports, including one the District Court did not reach. *See*

*Herring v. Fed. Deposit Ins. Corp.*, 82 F.3d 282, 284 (9th Cir.1996).

tween the denial of class certification and the lodging of the Second Amended Complaint, the claims of the current individual plaintiffs would normally be time-barred. As discussed in the next section, however, the relation back doctrine applies under the circumstances of this case and makes the claims of the current individual plaintiffs timely.[13]

### C. The Second Amended Complaint relates back to the original Complaint and was, therefore, timely.

■ Federal Rule of Civil Procedure 15(c) provides in relevant part:

An amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, ... the amendment changes the party or the naming of the party against whom a claim is asserted ... and, within the period provided ... for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. R. Civ. Pro. 15(c). The Advisory Committee Note to the 1966 Amendment to Rule 15(c) observes that "[t]he relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier" and goes on to comment that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." Fed. R. Civ. Pro. 15(c) advisory committee's note.

■ In the Ninth Circuit,

An amendment adding a party plaintiff relates back to the date of the original pleading only when: 1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff.

*Rosenbaum v. Syntex Corp.*, 95 F.3d 922, 935 (9th Cir.1996) (citing *Besig v. Dolphin Boating & Swimming Club,* 683 F.2d 1271, 1278–79 (9th Cir.1982)).

In the present case, the original Complaint and the Second Amended Complaint were both filed "on behalf of persons who are statutorily eligible for legalization pursuant to the Immigration Reform and Control Act of 1986 (IRCA), but who have been unlawfully denied access to legalization benefits by the defendants." In particular, the original Complaint and the Second Amended Complaint both challenged the INS's regulations and practices defining and interpreting the term "known to the Government" as used in the IRCA. The original Complaint thereby placed the INS on notice that all aliens covered by the INS's regulations and practices defin-

---

**13.** Plaintiffs cite two out-of-circuit decisions for the proposition that following *reversal* of an order denying class certification, all claims embraced in the complaint relate back to the date on which the action was originally filed. *See Knable v. Wilson,* 570 F.2d 957, 964 n. 46 (D.C.Cir.1977); *Esplin v. Hirschi,* 402 F.2d 94, 101 n. 14 (10th Cir.1968). These authorities do not help plaintiffs, because in the present case, there never was a *reversal* of the November 4, 1988 order denying class certification. Rather, on September 8, 1995, the District Court certified a *different* class represented by *different* individual plaintiffs. *Knable* and *Esplin* are, therefore, not relevant in the circumstances of the present case.

ing and interpreting the term "known to the Government" as used in the IRCA were potential plaintiffs. Thus, the notice requirement of Rule 15(c) is met in the present case. *See Rosenbaum*, 95 F.3d at 935.

In the original Complaint, plaintiffs John Doe 1 and 2 alleged that they "accepted employment" and "did not file quarterly status reports" and were therefore "in violation of the terms of [their] non-immigrant visa." In the Second Amended Complaint, new plaintiffs John Doe 1 and 2 similarly alleged that "they violated the terms of [their] nonimmigrant visa by working" and "failing to submit required address reports." Moreover, in the original Complaint, plaintiffs John Doe 1 and 2 stated that they "wishe[d] to qualify for legalization, but Defendant's current regulations [made them] ineligible." In the Second Amended Complaint, new plaintiffs John Doe 1 and 2 similarly stated that they "attempted to file an application for legalization ... but [were] prevented from applying because of the INS's policies and practices challenged in this lawsuit." The addition of new plaintiffs who are similarly situated to the original plaintiffs therefore did not cause the INS any prejudice in the present case. Thus, the no-prejudice requirement of Rule 15(c) is met in the present case. *See Rosenbaum*, 95 F.3d at 935.

Because the original individual plaintiffs and the current individual plaintiffs are "similarly situated," the identity-of-interest requirement of Rule 15(c) is also met in the present case. *See Rosenbaum*, 95 F.3d at 935. In *Raynor Brothers v. American Cyanimid Co.*, 695 F.2d 382 (9th Cir.1982), we found that the identity-of-interest requirement of Rule 15(c) was met because "[t]he circumstances giving rise to the claim remained the same [under the amended complaint] as under the original complaint." 695 F.2d at 384. By the same token, this requirement is also met in the present case because the same INS regulations and practices defining and interpreting the term "known to the Government" as used in the IRCA gave rise to the claims asserted in the original Complaint as well as to the claims asserted in the Second Amended Complaint. Furthermore, the present case is distinguishable from cases in which we found no identity-of-interest. *See, e.g., Rosenbaum*, 95 F.3d at 935 (no identity-of-interest securities fraud class action where "newly proposed class members bought stock at different values and after different disclosures and statements ... by Defendants"); *Besig*, 683 F.2d at 1279 (no identity-of-interest in gender discrimination class action where "amended complaint transformed the case from one seeking equal membership access to one seeking identical nonmember access").[14] Thus, the iden-

---

**14.** The facts at issue in the present case are similar to those at issue in *In re Glacier Bay*, 746 F.Supp. 1379 (D.Alaska 1990), a case in which the United States District Court for the District of Alaska allowed, under the relation back doctrine, "addition of new plaintiffs who are similarly situated to the original plaintiffs" although there was no "legal or familial relationship" between the two sets of plaintiffs. *See id.* at 1391. In *Glacier Bay*, commercial fisherman brought a class action to recover for economic and business losses they had sustained as a result of an oil spill off the Alaska coastline. After the expiration of the statute of limitations, an amendment to the

original class complaint sought to add as plaintiffs a fish spotter and a fish processor who were not members of the class and who had no "legal or familial relationship" to the original plaintiffs. *Id.* The District Court stated that the original class complaint "put defendants on notice that all those involved in the fishing industry in Cook Inlet were potential plaintiffs." *Id.* The District Court concluded that "[t]he addition of new plaintiffs who are similarly situated to the original plaintiffs does not cause defendants any prejudice." *Id.* Accordingly, the District Court allowed the addition of the new plaintiffs.

tity-of-interest requirement of Rule 15(c) is also met in the present case. *See Rosenbaum,* 95 F.3d at 935.

Because all three requirements identified in *Rosenbaum* for adding plaintiffs and relating their claims in the Second Amended Complaint back to the original Complaint are met in the present case, we affirm the District Court's decision that the claims of the current individual plaintiffs are timely.

## II. Standing and Ripeness

### A. Introduction

 In urging this Court to dismiss this action for lack of jurisdiction, the INS argues that none of the plaintiffs meet the applicable standing and ripeness requirements. The standing question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The ripeness question is "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* at 499 n. 10, 95 S.Ct. 2197. Both questions "bear[ ] close affinity" to one another. *Id. See also City of Auburn v. Qwest Corp.,* 260 F.3d 1160, 1172 n. 6 (9th Cir. 2001) (noting that standing "overlaps substantially" with ripeness and that in that case, both were "inextricably linked"). Standing and ripeness are questions of law that we review *de novo. See S.D. Myers, Inc. v. City & County of San Francisco,* 253 F.3d 461, 474 (9th Cir.2001); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 (9th Cir.2001). Both this Court and the Supreme Court have repeatedly addressed standing and ripeness questions under the IRCA in the context of this litigation (IAP) and its companion litigation (CSS). In addition, Congress has also weighed in· on these questions. We find it inappropriate to dismiss this case in whole or in part. Regarding those individual plaintiffs who alleged that they filed legalization applications, we hold that these plaintiffs have satisfied all jurisdictional requirements. Regarding those individual plaintiffs who alleged that the challenged INS policies and practices prevented them from filing an application, we hold that these plaintiffs have not yet satisfied certain jurisdictional requirements that Congress adopted after the Second Amended Complaint was filed. Rather than dismissing these plaintiffs and their claims from this action, we instead remand with instructions to allow these plaintiffs to further ·amend the Second Amended Complaint to satisfy the new jurisdictional requirements. The organizational plaintiffs should be allowed to similarly amend the· Second Amended Complaint. In any event, these plaintiffs will have standing to challenge the constitutionality of the new requirements, provided that they can show that the INS's front-desking policy was a substantial cause of their failure to apply.

### B. Jurisdiction may be established on the basis of the Second Amended Complaint.

Initially, the INS argues that jurisdiction must be established exclusively on the basis of the allegations in the original Complaint. This argument is foreclosed by our recent en banc decision in the CSS litigation. *See CSS v. INS,* 232 ·F.3d 1139. Following the dismissal of their action by this Court in *CSS III* for failure to satisfy the new jurisdictional requirements in 8

---

The application of the relation back doctrine in *Glacier Bay* further supports the application of the relation back doctrine in the present case.

U.S.C. § 1255a(f)(4)(C), the plaintiffs in that litigation filed a new class action in the District Court attempting to satisfy these requirements.[15] A three-member panel of this Court dismissed the new class action as time-barred. *See Catholic Soc. Servs., Inc. v. INS*, 182 F.3d 1053, 1058–61(9th Cir.1999) (*"CSS IV"*). An en-banc panel of this Court found otherwise, holding that the plaintiffs were entitled to tolling of the statute of limitations. *See CSS V*, 232 F.3d at 1149. Especially important in the present context is the en banc panel's criticism of the *CSS III* panel's decision to dismiss for lack of jurisdiction the original action in that litigation:

> We believe that it would have been by far the better course for the panel in *CSS [III]* to remand with instructions to allow amendment of the complaint to satisfy [jurisdictional] requirements [in 8 U.S.C. § 1255a(f)(4)(C) ] imposed for the first time while the case was on appeal. If the panel in *CSS [III]* had allowed such amendment, there would be no tolling ... issue[ ]. But because the panel ordered the dismissal of the action in *CSS [III]*, plaintiffs were obliged to file a new action rather than allowed to continue their pending action.

*CSS V*, 232 F.3d at 1146. Accordingly, the En Banc Court in *CSS V* recommended accepting an amended complaint to satisfy the new jurisdictional requirements in 8 U.S.C. § 1255a(f)(4)(C). Thus, in the present case, the jurisdictional requirements in 8 U.S.C. § 1255a(f)(4)(C) did not have to be met by the original Complaint, but can be met by the Second Amended Complaint, which was in fact filed *before* Congress passed 8 U.S.C. § 1255a(f)(4)(C). Moreover, even though we hold later on in this opinion that the allegations by some plaintiffs in the Second Amended Complaint do not meet these new requirements, which were "imposed for the first time" after it was filed, the *CSS V* En Banc Court's criticism of the *CSS III* panel's decision to dismiss the original action in that litigation mandates that we allow plaintiffs to further amend the Second Amended Complaint in this litigation to meet the new requirements.

C. *Individual plaintiffs John Doe 5 and John Doe 6, who alleged that they filed applications for legalization which have not yet been adjudicated because of the challenged INS practices, have ripe "procedural" claims over which the District Court has jurisdiction.*

■ Two of the individual plaintiffs, John Doe 5 and John Doe 6, alleged in the Second Amended Complaint that they filed applications which have not yet been adjudicated because of 14971 the challenged INS practices. These plaintiffs have ripe "procedural" claims over which the District Court has jurisdiction.

In *CSS II*, the Supreme Court concluded that "a [plaintiff's] claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." 509 U.S. at 59, 113 S.Ct. 2485. The Supreme Court further observed that "[o]rdinarily, of course, that barrier would appear when

---

**15.** The jurisdictional requirements of 8 U.S.C. § 1255a(f)(4)(C) are:

Notwithstanding any other provision of law, no court shall have jurisdiction of any cause of action or claim by or on behalf of any person asserting an interest under this section unless such person in fact filed an application under this section within the period specified by subsection (a)(1) of this section, or attempted to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer.

8 U.S.C. § 1255a(f)(4)(C).

the INS formally *denied* the alien's application on the ground that the regulation rendered him ineligible for legalization." *Id.* at 60, 113 S.Ct. 2485 (emphasis added). Because their applications have not yet been denied, plaintiffs John Doe 5 and John Doe 6 would not "ordinarily" satisfy ripeness. The Supreme Court, however, noted two other situations in which ripeness may be satisfied: (1) in the case of plaintiffs who were "front-desked," and (2) in the case of plaintiffs for whom "the front-desking policy was ... a substantial cause of their failure to apply." *Id.* at 63, 66 n. 28, 113 S.Ct. 2485. Because plaintiffs John Doe 5 and John Doe 6 filed applications, they do not fall within either of these two exceptions to the ripeness rule.

In her concurrence to the *CSS II* majority opinion, Justice O'Connor noted that she "would not go so far as to state that a suit challenging a benefit-conferring rule is necessarily unripe simply because the plaintiff has *not yet applied* for the benefit." 509 U.S. at 69, 113 S.Ct. 2485 (O'Connor, J., concurring) (emphasis added). By logical extension, a suit challenging a benefit-conferring rule is also not "necessarily unripe" simply because the agency has *not yet denied* a filed application. Instead, if according to Justice O'Connor, "the court can make a *firm prediction* that the plaintiff will apply for the benefit, and that the agency will deny the application by virtue of the rule," *id.* (emphasis added), then by logical extension the controversy may be ripe although the plaintiff has not yet applied and been denied, and also does not fall within either of the two exceptions to the ripeness rule.

The *CSS II* majority opinion commented that even if the "firm prediction" rule was applicable, the Court did not see "how such a 'firm prediction' could be made in this case." 509 U.S. at 59 n. 19, 113 S.Ct.

2485. The *CSS II* majority opinion pointed out:

As for the prediction that the plaintiffs "will apply for the benefit," we are now considering only the cases of those plaintiffs who, in fact, failed to file timely applications. As for the prediction that "the agency will deny the application by virtue of the [challenged] rule," we re-emphasize that in this case, access to the benefit in question is conditioned on several nontrivial rules other than the two challenged. This circumstance makes it much more difficult to predict firmly that the INS would deny a particular application "by virtue of the [challenged] rule," and not by virtue of some other, unchallenged rule that it determined barred an adjustment of status.

*Id.*

The *CSS II* majority did not reject Justice O'Connor's "firm prediction" rule, but rather concluded that the rule was not satisfied in that case: Because the *CSS II* plaintiffs in fact did not apply timely, it was impossible in that case to "firmly predict" that they would apply late. This is so because 8 U.S.C. § 1255a(f)(2) prohibits against all review of any "denial of adjustment of status under this section based on a late filing of an application for such adjustment." *See CSS II,* 509 U.S. at 60 n. 20, 113 S.Ct. 2485.

In *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431 (9th Cir.1996), we observed, in a different context, that the *CSS II* majority had not expressly disapproved of Justice O'Connor's "firm prediction" rule. *See Newcomb,* 82 F.3d at 1436. We then adopted this more liberal rule. *See id.* We now hold that the claims of plaintiffs John Doe 5 and John Doe 6 are ripe under this "firm prediction" rule.

In the present case, the first prong of Justice O'Connor's "firm prediction" rule—that the court can firmly predict that the

plaintiff will apply—is satisfied because plaintiffs John Doe 5 and John Doe 6 *did*, in fact, apply. The second prong of the "firm prediction" rule—that the court can firmly predict that the INS will deny the application by virtue of the challenged rule—may be more difficult to satisfy, but it is by no means impossible to satisfy in the present case. Plaintiff John Doe 5 not only alleged that he timely applied, but also that he maintained a continuous unlawful residence since before 1982. Plaintiff John Doe 5 thus allegedly met the first two requirements for adjustment of status. *See* 8 U.S.C. § 1255a(a)(1), (2). Plaintiff John Doe 5 did not specifically allege that he met the remaining two requirements for adjustment of status, *i.e.*, continuous physical presence since November 6, 1986, and admissibility as an immigrant. *See* 8 U.S.C. § 1255a(a)(3), (4). Instead, plaintiff John Doe 5 generally alleged that his application "should have been approved" but "has not yet been approved because of the INS's policies and practices challenged in this lawsuit." Similarly, plaintiff John Doe 6 alleged that he timely applied, that he has resided continuously and unlawfully in the United States since 1981, and that he "qualifies for legalization under 8 U.S.C. § 1255a." While it is possible that the INS would hold such applications in abeyance for more than fourteen years and then deny them "by virtue of some other, unchallenged rule," rather than the INS's interpretation of the "known to the government" requirement, this possibility is so remote that a court can firmly predict that the INS will eventually deny these applications "by virtue of the[challenged] rule." Thus, the claims of plaintiffs John Doe 5 and John Doe 6 are ripe under Justice O'Connor's "firm prediction" rule.

■ The IRCA provides, however, that "[t]here shall be no . . . judicial review of a *determination* respecting an application for adjustment of status under this section except in accordance with this subsection" and that "[t]here shall be judicial review of . . . a denial [of an application for adjustment of status] only in the judicial review of an order of deportation under section 1105a of this title." 8 U.S.C. §§ 1255a(f)(1), (4)(A) (emphasis added). As a rule, such appeals of deportation orders must be brought individually before a Circuit Court of Appeals, rather than—as here—as a class action before a District Court. *See* 8 U.S.C. § 1105a (*repealed by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996). In short, if 8 U.S.C. §§ 1255a(f)(1), (4)(A) were to apply here, this class action suit could not be brought. This limit on judicial review arguably does not limit the review of *pending* applications, because such cases do not involve a "review of a *determination* respecting an application." 8 U.S.C. § 1255a(f)(1) (emphasis added). And even if 8 U.S.C. §§ 1255a(f)(1), (4)(A) would normally limit the review of *pending* applications, it does not do so where, as here, plaintiffs' challenges are *procedural* rather than *substantive*.

In *Naranjo–Aguilera*, we noted an exception for procedural rather than substantive challenges to § 1255a(f)'s limited review scheme:

> [D]istrict courts have jurisdiction over "collateral," "procedural" challenges to INS practices in the processing of applications, such as the front-desking in *CSS [II]* . . . . Where plaintiffs challenge alleged INS application-processing practices on a nationwide scale, a class action lawsuit with district court discovery mechanisms is an appropriate, and indeed the most effective, method of judicial review.

30 F.3d at 1112–13. Thus, if the claims by plaintiffs John Doe 5 and John Doe 6 qualify as procedural challenges to INS

practices in the processing of their applications, the District Court had jurisdiction over these claims.

This Court has already concluded that the relief granted by the District Court in *IAP I* and *IAP II* was procedural:

> The INS argues that the district court erred when it issued injunctive relief that required the agency to use a particular *procedure* under which nonimmigrants could prove that their unlawful status was "known to the government." We disagree with the agency's contention and conclude that the district court in establishing such *procedure* properly exercised its discretion to structure equitable relief.

*IAP III*, 976 F.2d at 1209 (emphasis added).

There is no reason to revise this assessment now. Plaintiffs John Doe 5 and John Doe 6 challenge the INS policy and practice of not accepting the absence of the aliens' address reports from the INS files as proof that their unlawful status was known to the government. *See* 8 C.F.R. § 245a.1(d)(1), (2). Plaintiffs John Doe 5 and John Doe 6 further challenge the INS policy and practice of requiring applicants like them to prove that their unlawful status was "known ' to the government" by "produc[ing] documentation from a school ... which establishes that the said school forwarded to the [INS] a report that clearly indicated the applicant had violated his or her nonimmigrant student status prior to January 1, 1982." 8 C.F.R. § 245a.1(d)(4). Plaintiffs John Doe 5 and John Doe 6 thus challenge the *procedure* that the INS required them to follow in proving that their unlawful status was known to the government. The District Court agreed and set up a different burden-shifting *procedure*. *See IAP II*, 717 F.Supp. at 1448–49.

In *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), the Supreme Court held that the District Court did have jurisdiction over a challenge to the INS implementation of the IRCA's Special Agricultural Workers ("SAW") legalization program similar to the challenges in the present case, and it upheld injunctive relief similar to the injunctive relief at issue here. To be eligible for legalization under the SAW, applicants had to prove that they performed seasonal agricultural services in the United States for at least ninety days during a specified period. *See* 8 U.S.C. § 1160(a)(1)(B). The plaintiffs in *McNary* contended that the INS had imposed an unlawful burden of proof by requiring applicants to produce corroborating evidence in addition to affidavits to prove performance of the requisite ninety days of seasonal agricultural services. *See Haitian Refugee Ctr., Inc. v. Nelson*, 694 F.Supp. 864, 866 (S.D.Fla. 1988). The District Court agreed and issued an injunction which read in part as follows:

> In those cases [in] which the INS denied [legalization] based in whole or in part on the fact that the applicant failed to submit payroll records or piecework receipts, the INS shall vacate the denials and reconsider the cases in light of the proper standard of proof which will require the government to present evidence to negate the just and reasonable inference created by the affidavits and other documents submitted by the applicant.

*Id.* at 881. The Supreme Court held that the District Court had jurisdiction over the plaintiffs' class action challenge and affirmed. *See McNary*, 498 U.S. at 494, 498, 111 S.Ct. 888. The Supreme Court did so although the SAW contains a scheme limiting judicial review that is identical to the statutory scheme at issue in the present

case. *Compare* 8 U.S.C. §§ 1160(e)(1), (3)(A), *with* 8 U.S.C. §§ 1255a(f)(1), (4)(A). The Supreme Court's decision in *McNary* supports the conclusion that the District Court also had jurisdiction over the similar challenges in the present case, which involve the burden of proving that the applicant's unlawful status was known to the government, and that the injunction the District Court issued—which was similar to the one the Supreme Court upheld in *McNary*—was proper.

■ Plaintiffs John Doe 5 and John Doe 6 do not challenge "INS's interpretations of IRCA's *substantive* eligibility requirements," *i.e.*, whether they are eligible for adjustment of status. Instead, plaintiffs John Doe 5 and John Doe 6 challenge the *procedure* by which they have to prove that they are eligible for adjustment of status.[16] Because the claims of plaintiffs John Doe 5 and John Doe 6 qualify as procedural challenges to INS practices in the processing of their applications, the District Court had jurisdiction over these claims and could entertain them as class

actions. *See Naranjo–Aguilera*, 30 F.3d at 1112–13.[17] The fact that the District Court had jurisdiction over the claims by plaintiffs John Doe 5 and John Doe 6 and the class members they represent is especially important because these plaintiffs are the only plaintiffs to which the preliminary injunction in the 1999 Order on appeal before us granted any relief. *See infra* section IV.

> *D. Individual plaintiffs John Doe 1, John Doe 2, John Doe 8, and others like them, who alleged that they did not file applications for legalization because of the challenged INS policies and practices, may have ripe claims over which the District Court has jurisdiction.*

In the Second Amended Complaint, some of the individual plaintiffs alleged that they did not file applications for legalization because of the challenged INS policies. These plaintiffs may qualify as "front-desked" class members whose

---

16. Our conclusion that plaintiffs' challenges are procedural conflicts with the conclusion of the Court of Appeals for the District of Columbia Circuit in *Ayuda, Inc. v. Reno*, 7 F.3d 246 (D.C.Cir.1993). There, as here, the issue was "whether the absence of quarterly reports in an alien's INS file put the government on constructive notice that the alien's illegal status was 'known to the government.'" *Id.* at 247. The *Ayuda* court took this to be a substantive challenge and, therefore, held that it lacked jurisdiction. *See id.* at 248.

17. Plaintiffs John Doe 5's and John Doe 6's claims are different from the claims that this Court found substantive rather than procedural in *Naranjo–Aguilera*. There, the plaintiffs challenged the INS's interpretation of the SAW legalization program's provision that "the Attorney General *may* ... provide for termination of the temporary resident ... if ... the alien ... is convicted of a felony or 3 or more misdemeanors committed in the United States." 8 U.S.C. § 1160(a)(3)(B) (emphasis added). Specifically, the *Naranjo–*

*Aguilera* plaintiffs "argued that the INS has an unlawful policy of treating th[is] rule as a *per se* ground for denial or termination of temporary resident status, rather than as one factor to be weighed, in the INS's discretion and on a case-by-case basis, along with other positive and negative factors." 30 F.3d at 1109. Thus, the plaintiffs in *Naranjo–Aguilera* challenged the interpretation of the word "may" in 8 U.S.C. § 1160(a)(3)(B), and *whether they were eligible* for continuation of temporary resident status. We concluded that this was not a " 'procedural' challenge[ ] to INS practices in the processing of applications," but rather a "challenge [to] INS's interpretations of IRCA's *substantive* eligibility requirements." *Id.* at 1114. Accordingly, we held that the District Court lacked jurisdiction over the plaintiffs' challenges. *See id.* By contrast, in the present case, the controversy is not about whether plaintiffs are eligible for legalization, but about *whether they have proved that they are eligible* for legalization. The latter controversy is *procedural* in nature.

claims "should not fail for lack of ripeness," *CSS II,* 509 U.S. at 63, 113 S.Ct. 2485, and who meet the. IRCA's jurisdictional requirement because they "attempted to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer." 8 U.S.C. § 1255a(f)(4)(C). In addition, even non-front-desked class members have standing to challenge the constitutionality of 8 U.S.C. § 1255a(f)(4)(C), provided that they can "demonstrate that the front-desking policy was a nevertheless a substantial cause of their failure to apply." *CSS II,* 509 U.S. at 66 n. 28, 113 S.Ct. 2485.

■ For example, we previously suggested that plaintiffs John Doe 1 and John Doe 2 "may have alleged facts sufficient to grant them standing." *IAP VI,* 134 F.3d 377, 1998 WL 42224 at *1. Both alleged in the Second Amended Complaint that they "attempted to file an application for legalization during the application period but w[ere] prevented from applying because of the INS's policies and practices challenged in this lawsuit." Plaintiff John Doe 1 alleged, in particular, that he "presented an application to the Immigration Service at a legalization office" and that "[t]he legalization office refused to accept this application." Similarly, plaintiff John Doe 2 alleged that he "went to a Qualified Designated Entity ('QDE') to file his application" and that "[t]he QDE told [him] that he was not eligible for the legalization program and that they would not accept his application for filing." And plaintiff John Doe 8—the only individual plaintiff who is a resident of Washington and on whom venue in the Western District of Washington could be based, *see*

*infra* section III—alleged that he "sought to file a completed amnesty application at the Seattle INS" and that "[t]he INS employee at the front counter reviewed his application and told him that he was not eligible to apply." [18]

The District Court held that these allegations in the Second Amended Complaint are sufficient because they meet the "notice pleading" requirements of Fed. R.Civ.P. 8(a)(2). Rule 8(a)(2) requires any pleading which sets forth a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This rule "require[s] that the pleading . . . give[ ] the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure § 1215* (2d ed.1990). The allegations by plaintiffs John Doe 1, John Doe 2, and John Doe 8 in the Second Amended Complaint indeed "give[ ] the [INS] fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved," 5 Miller & Wright, *supra* at § 1215, and thus meet the requirements of notice pleading.

The INS argues, however, that more than mere notice pleading ·is required. Specifically, the INS argues that plaintiffs had to allege—but failed to do so—each element of the jurisdictional requirements in 8 U.S.C. § 1255a(f)(4)(C), i.e., that they "in fact filed an application" or "attempted to file a complete application and application fee with an authorized legalization officer . . . but had the application and fee refused by that officer." *CSS III* provides considerable support for this argument.

---

**18.** Our previous suggestion that plaintiffs John Doe 1 and John Doe 2 "may have alleged facts sufficient to grant them standing," *IAP VI,* 134 F.3d 377, 1998 WL 42224 at *1, does not, by its silence as to other plaintiffs, prevent plaintiffs such as John Doe 8 from establishing standing.

There, we dismissed the plaintiffs' action for lack of standing "[b]ecause none of the class members or named plaintiffs have *alleged that they actually tendered an application and fee or attempted to do so* but were rebuffed by a legalization assistant." 134 F.3d at 927 (emphasis added). *See also id.* at 928 (holding that the District Court did not have jurisdiction over the action because "no facts had been alleged that any of the class members had submitted applications pursuant to [8 U.S.C. § 1255a(f)(4)(C)]'s requirements").

*CSS III* thus suggests that plaintiffs had to allege that "they actually tendered an *application and fee* or attempted to do so" to have standing to challenge the INS's interpretation of 8 U.S.C. § 1255a(a)(2)(B)'s requirement that an "alien's unlawful status was known to the Government." None of the individual plaintiffs have made such allegations in the Second Amended Complaint or elsewhere. For example, plaintiffs John Doe 1 and John Doe 2 both alleged that they "attempted to file an application," but neither alleges that he "attempted to ... tender[ ] a[ ] fee." Similarly, John Doe 8 alleged that he "sought to file a completed amnesty application," but does not mention any fee. Under *CSS III*, these allegations are not sufficient to establish standing.

We nevertheless "remand with instructions to allow amendment of the complaint to satisfy [the jurisdictional] requirements [in 8 U.S.C. § 1255a(f)(4)(C)]," as recommended by our En Banc Court in *CSS V*,

232 F.3d at 1146, rather than dismiss the action, as the INS requests. As we observed en banc in *CSS V*, remand would be "far the better course" than dismissal because it would allow plaintiffs "to continue their pending action" rather than requiring them "to file a new action." *Id.*[19]

■ In addition, even some non-frontdesked class members may have standing to challenge the constitutionality of this jurisdictional requirement. This group includes those individual plaintiffs who alleged that they did not file applications for legalization because of the challenged INS policies, but who do not meet the IRCA's jurisdictional requirements because they did not "attempt[ ] to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer," 8 U.S.C. § 1255a(f)(4)(C). In *CSS II*, the Supreme Court left open the possibility that "further facts would allow [such] class members who were not [actually] front-desked to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply," making their claims ripe. 509 U.S. at 66 n. 28, 113 S.Ct. 2485. In 1996, Congress foreclosed this possibility by amending the IRCA to deny the courts jurisdiction over any § 1255a case unless the plaintiff either "*in fact filed an application* ... or *attempted to file a complete application and application fee* with an authorized legalization officer of the Service but had the application and fee refused by that offi-

---

19. If we instead decided to dismiss this action, plaintiffs would be allowed to file a new action because "a complaint is not subject to dismissal with prejudice unless it appears to a certainty that no relief can be granted under any set of facts that can be proved in support of its allegations." Wright and Miller, *supra* at § 1215. Here, plaintiffs John Doe 1, John Doe 2, and John Doe 8 could presumably prove that they attempted to tender the re-

quired fee, and it does not "appear[ ] to a certainty that no relief can be granted" under that set of facts. Moreover, a new action filed by any of the named plaintiffs or class members sufficiently soon after the dismissal of the present action would be timely because the statute of limitations remains tolled during the pendency of the present action. *See supra* section I.B; *see also CSS V*, 232 F.3d at 1146–49.

cer." 8 U.S.C. § 1255a(f)(4)(C) (emphasis added). Non-front-desked class members should be allowed "to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply," making their claims ripe under *CSS II*, 509 U.S. at 66 n. 28, 113 S.Ct. 2485, and to challenge the constitutionality of the more stringent jurisdictional requirements in 8 U.S.C. § 1255a(f)(4)(C). *See CSS V*, 232 F.3d at 1152 (plaintiffs who did not meet the jurisdictional requirements of 8 U.S.C. § 1255a(f)(4)(C) had standing to challenge the constitutionality of that statute).

### E. The organizational plaintiffs may have ripe claims over which the District Court has jurisdiction.

■■■ In *IAP IV*, Justice O'Connor held that the IRCA did not give organizational plaintiffs standing to sue on their *own* behalf. *See* 510 U.S. at 1305–06, 114 S.Ct. 422. Importantly, Justice O'Connor also held that the IRCA gave organizational plaintiffs representative standing to sue on behalf of their *members* whose claims are ripe. *See id.* at 1306, 114 S.Ct. 422. Moreover, legal aid organizations, like law firms, may have third party standing to assert the constitutional rights of their *clients* whose claims are ripe. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

None of the organizational plaintiffs alleged in the Second Amended Complaint that any of their members or clients had "actually tendered an application and fee or attempted to do so but were rebuffed by a legalization assistant" and that they had thus met the jurisdictional requirements of 8 U.S.C. § 1255a(f)(4)(C). Instead, plaintiffs Immigration Assistance Project and Hermandad Mexicana Nacional, for example, merely alleged that their members and clients had been and would continue to be injured by the challenged INS policies and practices. Under *CSS III*, 134 F.3d at 927, these allegations are not sufficient to establish that these members and clients of the organizational plaintiffs have ripe claims. *See supra* section II.D. Under *IAP IV*, 510 U.S. at 1305–06, 114 S.Ct. 422, in turn, these allegations are then also not sufficient to give the organizational plaintiffs standing to sue on behalf of their members and clients.

For the reasons discussed above in section II.D, we "remand with instructions to allow amendment of the complaint to satisfy [the jurisdictional] requirements[in 8 U.S.C. § 1255a(f)(4)(C) ]," as we recommended en banc in *CSS V*, 232 F.3d at 1146, rather than dismiss the organizational plaintiffs and their claims, as the INS requests. Moreover, the organizational plaintiffs should be allowed, regarding their non-front-desked members and clients, "to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply," making their claims ripe under *CSS II*, 509 U.S. at 66 n. 28, 113 S.Ct. 2485, and to challenge the constitutionality of the more stringent jurisdictional requirements in 8 U.S.C. § 1255a(f)(4)(C).[20]

20. Plaintiff Washington Association of Churches states that it is "an association of churches" and mentions no members or clients other than churches. Nor does plaintiff Washington Association of Churches mention that its member churches have members or clients who meet either the jurisdictional requirements of 8 U.S.C. § 1255a(f)(4)(C) because they "tendered an application and fee or attempted to do so" or the ripeness requirement of *CSS II*, 509 U.S. at 66 n. 28, 113 S.Ct. 2485, because "the front-desking policy was … a substantial cause of their failure to apply." Unless plaintiff Washington Association of Churches can make the necessary allegations, it will not have standing. The issue of plaintiff Washington Association of Churches' standing is particularly important

## III. Venue in the Western District of Washington

The INS argues that venue is improper in the Western District of Washington. A civil action, such as this one, in which a defendant is an agency of the United States and in which no real property is involved, may be brought, *inter alia,* in any judicial district in which a plaintiff resides. *See* 28 U.S.C. § 1391(e). Venue is a question that the Ninth Circuit reviews *de novo. See Myers v. Bennett Law Offices,* 238 F.3d 1068, 1071 (9th Cir.2001).

Plaintiff John Doe 8 resides in Seattle and, thus, in the Western District of Washington. Plaintiff Washington Association of Churches presumably also resides in the Western District of Washington. If plaintiff John Doe 8 or plaintiff Washington Association of Churches can satisfy the jurisdictional requirements of 8 U.S.C. § 1255a(f)(4)(C) because they (or their members) have been front-desked, venue in the Western District of Washington will be proper for all purposes. If neither of these two plaintiffs can meet these jurisdictional requirements, but either of them would have standing under *CSS II,* 509 U.S. at 66 n. 28, 113 S.Ct. 2485, because the front-desking policy was a substantial cause of their (or their members) failure to apply, venue in the Western District of Washington will be proper for the limited purpose of challenging the constitutionality of the more stringent jurisdictional requirements of 8 U.S.C. § 1255a(f)(4)(C). Finally, if neither plaintiff John Doe 8 nor plaintiff Washington Association of Churches meets either the jurisdictional requirement of 8 U.S.C. § 1255a(f)(4)(C) or the standing requirement of *CSS II,* 509 U.S. at 66 n. 28, 113 S.Ct. 2485, plaintiffs will be able to further amend the Second Amended Complaint and add plaintiffs who do meet these requirements. *See supra* section I.C.

## IV. Class Certification

In its 1995 Order, the District Court certified "a class of individuals who ... [1] were deterred from filing an application because of INS's regulations and policies, or[2] who filed an application which has not resulted in a decision." In its 1999 Order, the District Court reinstated this class certification.

The INS argues this class certification was improper. The INS concedes that "a class certification order is not ordinarily reviewable on appeal in this posture" but argues that in the present case, the grant of class certification "is inextricably interwoven with the ... grant of injunctive relief and must be subject to review."

Our decision in *Paige v. California,* 102 F.3d 1035 (9th Cir.1996), gives limited support to the INS's view that the class certification is reviewable in the present case. In *Paige,* we applied the Supreme Court's "inextricably intertwined" test for pendent appellate jurisdiction over otherwise nonappealable collateral orders. *See id.* at 1039 (quoting *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995)). We concluded that "[b]ecause the injunction issued here provides class-wide relief, we could not uphold it without also upholding the certification of the class." *Id.* We further concluded that "[t]he certification of the class is therefore inextricably intertwined with the issuance of the interim injunction" and that "[a]ccordingly, ... we have jurisdiction to consider both." *Id.* at 1039–40.

because it is the only plaintiff, other than plaintiff John Doe 8, who is a resident of Washington and on whom, therefore, venue

in the Western District of Washington could be based. *See supra* section II.D. and *infra* section III.

■ In the present case, the 1999 Order does not provide "classwide relief," but it does provide relief for certain class members. We have jurisdiction to review the certification of the class as to these members. For example, the District Court ordered the INS to "notify *all class members with pending legalization applications* of the name, address and telephone number of counsel for plaintiffs within 30 days of this order." (Emphasis added). We, therefore, "could not uphold" the 1999 Order "without also upholding the certification of the class" in the 1995 Order *as to members with pending legalization applications. Paige,* 102 F.3d at 1039. As in *Paige,* "[t]he certification of the class [*as to members with pending legalization applications* ] is therefore inextricably intertwined with the issuance of the interim injunction" and "[a]ccordingly," we have "jurisdiction to consider both." *Id.* at 1039–40.

■ We review a District Court's decision to certify a class for an abuse of discretion. *See Hawkins v. Comparet–Cassani,* 251 F.3d 1230, 1237 (9th Cir. 2001). "A court abuses its discretion if its certification order is premised on legal error." *Id.* For the reason discussed below, the District Court did not abuse its discretion in the present case when it certified a class including members with pending legalization applications.

As discussed above in section II.C, plaintiffs with pending legalization applications have claims that are ripe under Justice O'Connor's "firm prediction" test and the District Court had jurisdiction over these claims because they are "procedural" challenges to INS practices in the processing of applications. *See CSS II,* 509 U.S. at 69, 113 S.Ct. 2485 (O'Connor, J., concurring); *Naranjo–Aguilera,* 30 F.3d at 1112–13.

The INS argues that certification of a class of plaintiffs with pending legalization applications was nevertheless improper because "plaintiffs have not presented any evidence to demonstrate the class is so numerous that joinder is impracticable" as required by Fed.R.Civ.P. 23(a).[21] Plaintiffs point out, however, that "[t]here are approximately 11,000 timely applicants affected by [the District Court's] orders." Courts have certified classes with far fewer members. *See Jordan v. County of Los Angeles,* 669 F.2d 1311, 1319 & n. 10 (9th Cir.1982) (stating inclination "to find the numerosity requirement ... satisfied solely on the basis of the number of ascertained class members, i.e., 39, 64, and 71," and listing thirteen cases in which courts certified classes with fewer than 100 members), *vacated on other grounds,* 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). The District Court, therefore, did not abuse its discretion when it decided that the numerosity requirement was met in the present case.

■ The INS also argues that "plaintiffs have not demonstrated that they can satisfy the commonality and typicality requirements" of Fed.R.Civ.P. 23(a). But the INS makes this argument only with respect to front-desked class members.[22]

**21.** Fed.R.Civ.P. 23(a) provides:

One or more members of a class may sue ... as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims

... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**22.** Specifically, the INS argues:

Here the claims of any member of the proposed plaintiff class will be based entirely on highly individualized testimony about what transpired when they *attempted to file*

The certification of the class as to members "who ... were deterred from filing an application because of INS's regulations and policies," *i.e.*, as to front-desked members,[23] is *not* "inextricably intertwined" with the issuance of the injunction in the 1999 Order, which does not benefit front-desked class members, but instead benefits only class members with pending legalization applications. Accordingly, we do *not* have jurisdiction to consider the propriety of the class certification *as to front-desked class members. See Paige,* 102 F.3d at 1039–40. The 1999 Order states:

> The defendants are hereby ordered to: (1) provide the plaintiffs within 30 days of this order the number of applications that have been filed by class members, the number of such applications that have been adjudicated, and the number that are still pending; (2) provide the plaintiffs with quarterly reports thereafter stating the number of class members applications adjudicated during that period and the number of applications that remain pending; (3) notify all class members with pending legalization applications of the name, address and telephone number of counsel for plaintiffs within 30 days of this order. The court further instructs the INS to adjudicate such applications in accordance with the procedures established in this court's

rulings at [*IAP I,*] 709 F.Supp. 998 and [*IAP II,*] 717 F.Supp. 1444 (W.D.Wash. 1989).

The INS concedes that in the 1999 Order "the district court awarded interim relief" only to "those who claim to have timely filed legalization applications." Because the injunction in the 1999 Order does not benefit front-desked class members, we can uphold the injunction without reaching the question whether the class certification in the 1995 Order was proper *as to front-desked class members.* The certification of the class as to front-desked class members is therefore not "inextricably intertwined" with the issuance of the injunction. *See Paige,* 102 F.3d at 1039. Under our limited grant of jurisdiction, we may not review the class certification *as to front-desked class members. See id.* at 1040.

## V. Propriety of Temporary Protective Relief

 The INS argues that the District Court improperly granted temporary protective relief to class members with pending legalization applications. We review the grant of a preliminary injunction for abuse of discretion. *See Textile Unlimited, Inc. v. A. BMH & Co.,* 240 F.3d 781, 786 (9th Cir.2001). In section III.C of this decision, we held that the District Court had jurisdiction over the claims of

---

*a complete application and application fee and had the application and application fee refused.* At trial, each member of the proposed class would be required ... to prove that *they actually presented a complete application to an authorized officer of the INS, along with the required fee, and had both the application and the fee refused by that officer.*

(Emphasis added).

23. Strictly speaking, this sub-class includes not only front-desked members, but also non-front-desked members who meet *CSS II's* ripeness requirements because they can "demonstrate that the front-desking policy

was nevertheless a substantial cause of their failure to apply," 509 U.S. at 66 n. 28, 113 S.Ct. 2485, but who do not meet the IRCA's more stringent jurisdictional requirements because they did not "attempt[ ] to file a complete application and application fee with an authorized legalization officer of the Service but had the application and fee refused by that officer." 8 U.S.C. § 1255a(f)(4)(C). As discussed above in section II.D, these class members have standing to challenge the constitutionality of the IRCA's jurisdictional requirements on equal protection grounds. For simplicity's sake, we refer to all members in this sub-class as front-desked members.

class members with pending legalization applications. We now hold that the preliminary injunction was properly granted to these class members.

This Court already rejected most of the INS's arguments in *IAP III* when it affirmed the similar temporary protective relief granted by the District Court in *IAP I* and *IAP II*. Moreover, contrary to the INS's remaining arguments, neither the Supreme Court's subsequent ruling in *CSS II* nor other subsequent rulings render the injunction improper. In its 1999 Order, the District Court instructed the INS "to adjudicate [pending] applications in accordance with the procedures established in this court's rulings" in *IAP I* and *IAP II*. In *IAP III*, we affirmed these procedures. The INS raises three arguments that subsequent rulings have completely or partially invalidated IAP I, *IAP II*, and *IAP III*.

First, the INS argues that after *CSS II*, the District Court no longer has jurisdiction over claims by plaintiffs whose applications have not yet been decided. As discussed in section II.C, however, *CSS II* did not destroy District Court jurisdiction over *procedural* claims by plaintiffs with pending applications, including the claims by plaintiffs in the present case.

Second, the INS argues that the 1999 Order did not afford *Chevron* deference to the INS's own interpretation of the "known to the government" requirement. The 1999 Order instructed the INS, *inter alia*, to adjudicate pending applications in accordance with the burden-shifting mechanism established in *IAP II* for section 265 violators. Under this mechanism, knowledge of an applicant's unlawful status can be imputed to the government from the *absence* of the alien's required quarterly address reports from the INS's files. In *In re H*, 20 I. & N. Dec. 693 (BIA 1993), the BIA, however, held that "[i]t is not reasonable to impute knowledge to the

Government based on the absence of a document." 20 I. & N. Dec. at 696. And in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court held that "a court may not substitute its own construction of a statutory provision for a *reasonable interpretation* made by the administrator of an agency." 467 U.S. at 844, 104 S.Ct. 2778 (emphasis added).

The BIA's holding in *In re H*, that knowledge of an applicant's unlawful status could not be imputed to the government through the absence from the INS's files of quarterly address reports required by § 265, is *not* a "reasonable interpretation" of § 1255a(a)(2)(B)'s "known to the government" requirement. In affirming the burden-shifting mechanism established in *IAP II*, we observed:

> The record shows that before January 1, 1982, the INS reviewed agency records to determine whether nonimmigrants had complied with the reporting requirements under section 265. The absence of the required section 265 report identified those in violation. As a consequence of its own practices, the INS had *actual knowledge* of an alien's unlawful status.

*IAP III*, 976 F.2d at 1209. Indeed, the INS's own prior practice of identifying section 265 violators through the absence of address reports makes it unreasonable for the government to claim later that knowledge of an applicant's unlawful status could not be imputed to the government through the absence of the same address reports. The INS's interpretation of the "known to the government" requirement did not become reasonable when the BIA affirmed this interpretation in *In re H*. Under *Chevron*, the District Court was not required to defer to the INS's unreasonable interpretation of the "known to the

government" requirement. It was, therefore, appropriate for the District Court to instruct the INS to abandon its interpretation of the requirement and instead to adjudicate pending applications in accordance with the burden-shifting mechanism established in *IAP II*.

Third, the INS argues that the 1999 Order violated rational-basis review as defined in *Heller v. Doe*, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The 1999 Order instructed the INS, *inter alia*, to adjudicate 14991 pending applications in accordance with the burden-shifting mechanism established in *IAP II* for student visa violators. The burden-shifting mechanism in *IAP II* was in turn based on the District Court's conclusion in *IAP I* that the INS's distinction between two groups of student visa violators—students who had violated their visas by not taking a required number of class hours, and who were required to prove that their unlawful status was known to the government, and students who had violated their visas by remaining in the United States after they graduated, and who were required only to prove that their lawful status had expired before January 1, 1982—was an "irrational classification" that "violate[d] the equal protection guarantee" of the Fifth Amendment to the U.S. Constitution. *IAP I*, 709 F.Supp. at 1003.

In *Heller*, the Supreme Court reaffirmed that under rational-basis review, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" 509 U.S. at 320, 113 S.Ct. 2637 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). The Supreme Court further held that "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* at 321, 113 S.Ct. 2096. The Supreme Court cautioned, however, that "even the standard of rationality ... must find some footing in the realities of the subject addressed by the legislation." *Id.*

Plaintiffs argue that *Heller* does not apply to the present case because *Heller* involved a classification by an *agency* rather than, as in the present case, a *legislature*. We reject this argument in light of the fact that the Supreme Court vacated *IAP I* and *IAP II* and remanded it specifically "for further consideration in light of *Heller.*" *IAP v. INS*, 510 U.S. 1007, 114 S.Ct. 594.

In *IAP III*, we agreed with the District Court that there was "no rational basis between the two groups to justify requiring ... nonimmigrant[ ][students who had violated their visas by not taking a required number of class hours] to meet different proof requirements for showing unlawful status as compared to other nonimmigrant students ... who were similarly situated." 976 F.2d at 1211. There is no reason to change this assessment after *Heller*. Whether a student has taken a required number of class hours can be just as easily verified as whether a student has graduated. Both types of information are, for example, readily available in the school files. *See also IAP III*, 976 F.2d at 1212 n. 28 (noting that because "[f]ederal immigration regulations required schools to notify the INS if any of these individuals violated immigration laws," "both groups of aliens are similarly situated with respect to IRCA's requirement for amnesty that their unlawful status be 'known to the government' "). There is, therefore, no "reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 320, 113 S.Ct. 2637. Moreover, the fit between means and ends in the present case is not

merely "imperfect." *Id.* at 321, 113 S.Ct. 2637. Rather, there is no discernable fit at all. Nor does there appear to be "some footing" for the classification "in the realities of the subject addressed by the legislation." *Id.*[24]

More generally, the INS objects that plaintiffs have not met the requirements for a preliminary injunction. To receive a preliminary injunction, plaintiffs were required to show "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) (quoting *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir.1992)). This Court has explained that "[t]hese two alternatives represent 'extremes of a single continuum,' rather than two separate tests." *Id.* (quoting *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir.1978)). Thus, "the greater the relative hardship to the moving party, the less probability of success must be shown." *Id.* (quoting *National Ctr. for Immigrants Rights v. INS*, 743 F.2d 1365, 1369 (9th Cir.1984)). Conversely, "it has been held that a preliminary injunction may be granted even though the harm factor favors defendant if plaintiff demonstrates a substantial likelihood that he ultimately will prevail." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure § 2948.3* (2d ed.1995). *See also Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F.Supp. 923, 934 (C.D.Cal.1970) (stating that even if a party has not made "as satisfactory a showing of irreparable injury as is generally desirable," an injunction may still issue if it convinces the court "with reasonable certainty that it will ultimately succeed").

In the present case, plaintiffs have already convinced this Court that the INS's policy towards applicants who violated their visas by not filing the required quarterly address reports "represents an overly restrictive interpretation of [the] IRCA" and that there was "no rational basis" for the INS's policy towards applicants who violated their visas by, e.g., not taking a required number of class hours. *IAP III*, 976 F.2d at 1209, 1211. As discussed above, there is no reason to change these assessments now. Accordingly, there is an extremely high likelihood that plaintiffs will ultimately prevail. As a result, a mere possibility of irreparable harm will entitle plaintiffs to a preliminary injunction. It is certainly possible that individual plaintiffs and class members will have their applications denied due to the challenged INS policies and that this will, in turn, irreparably harm them because it, e.g., makes them deportable. The District Court, therefore, did not abuse its discretion when it granted the injunction.

## CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's reinstatement of its class certification order and its modified reinstatement of its order granting temporary relief. We REMAND to allow plaintiffs to amend the complaint to satisfy all jurisdictional and venue requirements as outlined above.

---

**24.** The INS also argues that under *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the District Court could only set aside—but not replace—the INS's procedure. This argument was already rejected by this Court in *CSS III. See* 976 F.2d at 1209–10 (rejecting the INS's contention that "only the agency may create specific proof requirements to effectuate IRCA's legalization program").

AFFIRMED in part and REMANDED in part.